PEARL STENSON, Respondent, v. SYLVIA LAN-CASTER, Appellant.

Kansas City Court of Appeals, April 6, 1914.

1. REPLEVIN: Pleading: Ownership. A petition in replevin in the circuit court should allege an ownership or right of property in the plaintiff.' Though it may be amended if one of such allegations is not made.

2. HUSBAND AND WIFE: Agency: Prize Contest. In a voting contest for the most popular lady in the community gotten up by a newspaper to increase its circulation and offering an automobile for a prize and two diamond rings for first and second prizes, the husband of one of the contesting ladies may be her agent, without authority in writing, in disposing of the principal prize if she won it.

3. ———: ———: Ratification: Pleading. If the husband acts as agent for his wife without authority from her, she is not bound unless she afterwards ratifies his acts. But ratification cannot be shown unless pleaded.

4. ———: ———: Evidence: Instructions. Agency of the husband or verbal authority to dispose of his wife's property should be shown by clear and unequivocal proof and the jury should be cautioned as to the relationship of husband and wife.

Appeal from Linn Circuit Court.—*Hon. Fred Lamb,* Judge.

REVERSED AND REMANDED.

*C. M. Kendrick* for appellant.

*Bresnehen & West* and *Ben L. White* for respondent.

ELLISON, P. J.—Plaintiff's action is replevin begun in the circuit court of Linn county for the possession of an automobile. She recovered judgment in that court.

Much of plaintiff's statement of the case is a fair history of the way in which this controversy arose and we reproduce it substantially:

Sometime in the summer of 1912 "The Marceline Mirror," a weekly newspaper then published in Marceline, Missouri, for the purpose of increasing its circulation, inaugurated what was commonly known as an "Automobile Contest," in which a Ford Runabout was to be given to the young lady who should get the most votes on the proposition of being the "Most Popular Young Lady in the Community."

This Ford Runabout was known as the "First Prize." There was also a "Second Prize," it being a diamond ring; then too, there was a "Special Prize," it being also a diamond ring.

The "First Prize" was to be given to the young lady who secured the largest number of votes during the entire contest on the proposition of being the "Most Popular Young Lady in the Community;" the "Second Prize" was to be given to the young lady who secured the second largest number of votes on the same proposition; and the "Third Prize" was to be given to the young lady who secured the largest number of votes on said proposition during a particular week of the contest. The votes were to be determined by the number of subscriptions for the "Marceline Mirror" turned in by each contestant, each subscription entitling the contestant to so many votes. Among those entering in this contest were the plaintiff, Miss Pearl Stenson, a young lady about seventeen years of age; the defendant, Mrs. Sylvia Lancaster, a young married woman; and Miss Geneva Roe, another young lady of the community. From the opening of the contest until its close, Mr. Sven Sten-

son, father of the plaintiff, took an active interest in behalf of his daughter's candidacy; and Mr. Glenn Lancaster, husband of defendant, took an equally active interest in behalf of the candidacy of his wife. Each worked for his own candidate. As the contest progressed it grew in interest and excitement until it became evident that plaintiff and defendant led all others and this continued until the evening of the last day. Both plaintiff and defendant were hopeful, yet each feared the other might win; and during all this time their advocates did not cease their activities in behalf of their respective candidates, Mr. Glenn Lancaster with others urging the interests of his wife, and Mr. Sven Stenson doing the same in behalf of his daughter.

Sometime in the afternoon of Sept. 14, 1912, before the contest was to close at 9:30 that evening, defendant's husband went to plaintiff's father and proceeded to open negotiations looking to an understanding between the contestants, as to which one of them should get the automobile. Among other things he pointed out to Mr. Stenson that it would be foolish for either contestant to put any more money into the contest, and that evening, just a few minutes before the contest was to close, Mr. Lancaster again went to Mr. Stenson and said to him, "Mr. Stenson, that contest is about to be closed now and please don't go and put that money into them fellows' hand, to get them to blow it in; leave it here in town." Stenson asked, "How am I going to do it?" Lancaster answered, "Give it to us just as we proposed a while back." Stenson inquired, "What is your proposition?" Lancaster answered, "Well, I'll tell you what we'll do. What is the least you will take?" Stenson answered, "I will take $250, and that is the least I will take to withdraw from the contest." Lancaster said, "You must be awfully sure about getting it." Stenson replied, "Yes, I am, I think we will win." Lancaster

answered, "We are just as equally sure, but what will you give us to withdraw?" Stenson said, "Well, I'll tell you what I'll do, I will give you $150, if you will withdraw from the contest." Lancaster said, "No sir, I will tell you what I will do, I will take $200." Stenson answered, "No, I won't give you that," and then continued. "Supposing somebody else, a third party might jump in there and get it?" Lancaster answered, "Oh, the third party is Geneva Roe, she is too far behind." Stenson then said, "Supposing Mr. Roe goes down there and puts in $300 or maybe more, that would be a cheap automobile for him to buy anyway." Lancaster replied, "Oh there is no danger of that." Stenson then said, "I will tell you what I will do, that is my last proposition, I will give you my check for $175 if you will withdraw from the contest under this agreement—that if Geneva Roe or her father should jump in and get it, that you will return $75 so that I would only be a loser of $100." Lancaster said, "All right, I'll do that." Mr. Stenson then drew his check on the First National Bank of Marceline to Mr. Lancaster for the sum of $175 and Mr. Lancaster accepted the check and started out (they were in Mr. Stenson's place of business) but Mr. Stenson said, "Hold on here, we have got to have this in black and white." Lancaster inquired, "Can't you depend on my word?" Stenson answered," Yes, but on an occasion like this, it is best to have it in black and white." Lancaster then said, "Well, write out any dog-gone thing you like and I'll sign it." Mr. Stenson then told him that he (Stenson) was not much of a scholar but that he would do the best he could. He then wrote what he thought would be sufficient, and Lancaster said, "Give me a pen." Stenson replied, "Hold on, your wife has got to sign that because she is the contestant.' Lancaster asked "What is the difference? She is my wife." Stenson replied, "That may be true, but it is best to have her

signature." Lancaster then said, "Well, I can't get her down in time." Stenson then asked, "Do you think it would be all right with her?" Lancaster answered "Yes," and continued, "Yes sir, if she were here she would sign it all right." Stenson then replied, "All right, you get her." Lancaster answered, "I won't have time, I'll sign her name for her, that will be all right won't it?" Stenson assented that he thought it would, saying, "Yes, that will be all right?" Then Mr. Lancaster signed the name of his wife (defendant) to the writing that Mr. Stenson had just prepared.

Mr. Lancaster then said to Mr. Stenson "I have got a few more subscriptions here I was aiming to turn in, but being I have sold out, you might as well take them and turn them in and save me the trouble." Stenson replied, "All right, I guess I can do that, but let's see how many you have got." Lancaster then stated that he had subscriptions amounting to $17 and proceeded to write Mr. Stenson a check for said sum of $17 for the subscriptions in place of the money he had collected for them. Mr. Stenson then went and turned in the subscriptions for his daughter and accounted to the managers of the contest for the $17.

The writing above mentioned which Mr. Lancaster signed for his wife was in words and figures as follows:

"Marceline Mo., September 14, 1912.

I hereby renounce my right to the first prize of the auto, in the automobile contest."

(Signed) "Mrs. Glenn Lancaster,

by G. C. Lancaster."

Plaintiff's father then gave his check to Mr. Lancaster for $175. This was tendered back the next morning. Under the arrangement thus reached, all right of Sylvia Lancaster in the automobile was said to be relinquished in favor of Pearl Stenson. Then if the final count of the votes should disclose that de-

fendant had received the highest number, under such arrangement plaintiff would be the owner of and entitled to the machine and defendant would have the money, $175. On the other hand, if such count should show that plaintiff had received the highest number of votes, she would, of course, get the machine.

Plaintiff insists that defendant was advised of this arrangement both before and after the contest had closed and the final count had been made and proclaimed, and that she expressed her acquiesence in, and satisfaction with such arrangement.

The petition failed to allege that plaintiff owned or had any interest in the property and for that reason failed to state a cause of action and defendant's objection thereto should have been sustained. [First Nat'l. Bank v. Ragsdale, 158 Mo. 668, 681; Benedict Mfg. Co. v. Jones, 60 Mo. App. 219; Randall v. Buchanan, 61 Mo. App. 445; Dillard v. McClure, 64 Mo. App. 491; Harmon v. Iden, 88 Mo. App. 314.] The petition may, however, be amended. [Donnell v. Miller, 133 Mo. App. 693.]

We are not satisfied with the manner of admission of evidence in the case. Near the entire case as made by plaintiff is based on the acts and negotiations of her husband. If the husband was acting for himself with a view of the money or property arising out of his action being taken from her and vested in him then his action was unlawful and void, since there is no pretence that he had any authority from her in writing. [Sec. 8309, R. S. 1909.] While that phase of the case was mentioned in the trial, we think the record shows that plaintiff seeks to bind defendant on the ground that her husband was her agent originally; or, if not, that she ratified his acts. It is true that the husband may be the wife's agent in business transactions, the proceeds being hers and no attempt made to get her property for himself, and his authority

need not be in writing. [Long v. Martin, 152 Mo. 668; Stone v. Bank, 81 Mo. App. 9.]

But in this case proof of his agency was allowed to go upon his own declarations, action, and conduct, without first showing prima facie that he was such agent. When that is made to appear then his acts and declarations may be shown. [Oil Well Supply Co v. Metcalf, (not yet officially reported), 160 S. W. 897; Peck v. Ritchie, 66 Mo. 114; Sumner v. Saunders. 51 Mo. 89.]

There was evidence tending to show that defendant ratified the acts of her husband in the contract he made with plaintiff's father. It is not of a very satisfactory character under all the circumstances, yet we cannot say if it had been properly pleaded it was not sufficient to submit to a jury.

In the state of the pleading defendant's instructions numbers 1 and 2 should have been given as offered. Ratifications was not pleaded and in absence of such plea, there was no proper issue made on that head. [Wade v. Hardy, 75 Mo. 394; Bray v. Marshall, Ibid 327; Noble v. Blount, 77 Mo. 235.]

Defendant's instruction number 3 was properly refused, unless something should appear in the case to show that her husband was converting the property or money to himself. The mere fact that he accepted the check in his own name is not conclusive. It could well be a circumstance if properly connected.

Instructions for plaintiff should be so worded as to require clear and unequivocal proof of agency or ratification, not beyond a reasonable doubt but by such preponderance of the evidence as to convince the jury after consideration of the relationship of husband and wife, and the jury should be cautioned as to that relationship and of the difference between the conduct of a wife and that of a woman acting in ordinary business affairs. [Long v. Martin, 152 Mo. 668.]

There was evidence offered tending to show that the machine was encumbered by a claim of $55 in the nature of a lien and that to get possession defendant was compelled to pay that sum. If a foundation for such claim appeared in the answer, such evidence would be proper. But as it is now drawn the court did not err in excluding it. [Delworth v. McKelvey, 30 Mo. 149; Hickman v. Dill, 32 Mo. App. 509; Bank v. Snyder, 85 Mo. App. 82, 85.]

The judgment is reversed and the cause remanded. All concur.